UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIZABETH COBLE,
MILAGROS HARPER, and
DENNIS HARPER,
on behalf of themselves and
all others similarly situated,

                Plaintiffs,

v.

COHEN & SLAMOWITZ, LLP,
DAVID COHEN, ESQ.,
MITCHELL SLAMOWITZ, ESQ.,
LEANDRE JOHN, ESQ., and
CRYSTAL S.A. SCOTT, ESQ.,

                Defendants.

11-cv-1037 (ER)(GAY)

**DECLARATION OF DANIEL A. SCHLANGER, ESQ. IN SUPPORT OF PLAINTIFFS' MOTION TO AMEND THE COMPLAINT**

**HON. EDGARDO RAMOS**
**HON. GEORGE A. YANTHIS**

---

DANIEL A. SCHLANGER, an attorney duly licensed to practice law in the State of New York, does hereby affirm under the penalty of perjury:

1. I am a partner at Schlanger & Schlanger, LLP, co-counsel for Plaintiffs and, as such, am familiar with the facts and documents relevant to this dispute.

2. I make this Declaration in support of Plaintiffs' Motion To Amend The Complaint.

3. Specifically, I submit this Declaration for the purpose of placing before this Court the following Exhibits:

   **Exhibit A:** The proposed Second Amended Complaint (including exhibits attached thereto);

   **Exhibit B:** Excerpts of the transcript of the deposition of Kenneth Vega, dated June 13, 2012;

   **Exhibit C:** Excerpts of the transcript of the deposition of Alfred Smith, dated June 14, 2012; and

   **Exhibit D:** Excerpts of the transcript of the deposition of Leandre John, Defendants' 30(b)(6) witness, dated December 14, 2012. This transcript has been deemed confidential and will be filed under seal with the Court pursuant to the Confidentiality Order entered on August 13, 2012.

4.  The legal arguments relevant to this motion have been set out in Plaintiffs' Memorandum of Law in support of the instant motion.

5.  For the reasons set forth more fully in Plaintiff's Memorandum of Law, Plaintiffs' Motion to Amend the Complaint should be granted in its entirety.

Dated:      New York, New York
            January 4, 2013

Respectfully Submitted,

Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
9 East 40th Street, Suite 1300
New York, NY 10016
Ph: 914-946-1981
Fax: 914-946-2930
daniel@schlangerlegal.com

Gary Klein, Esq.
(*admitted pro hac vice*)
Klein Kavanagh Costello LLP
85 Merrimac Street, 4th Floor
Boston, MA 02114
Ph: 617-357-5031
Fax: 617-357-5030
klein@kkcllp.com

Counsel for Plaintiffs

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
———————————————————————

ELIZABETH COBLE,
MILAGROS HARPER, and
DENNIS HARPER,
on behalf of themselves and
all others similarly situated,

                      Plaintiffs,

v.

COHEN & SLAMOWITZ, LLP,
DAVID COHEN, ESQ.,
MITCHELL SLAMOWITZ, ESQ.,
LEANDRE JOHN, ESQ., and
CRYSTAL S.A. SCOTT, ESQ.,

                   Defendants.
———————————————————————

**11-cv-1037 (ER)(GAY)**

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

**HON. EDGARDO RAMOS**
**HON. GEORGE A. YANTHIS**

Plaintiffs Elizabeth Coble, Milagros Harper and Dennis Harper, on behalf of themselves and all others similarly situated, for their complaint, allege, upon personal knowledge as to themselves and information and belief as to other matters, as follows:

## INTRODUCTION

1. This class action seeks to vindicate the rights of tens of thousands of New York consumers who have been or are being sued in consumer collection actions in which Defendant Cohen & Slamowitz, LLP ("C&S"), representing various creditors and debt buyers, caused to be filed Affidavits of Service provided to it by Midlantic Process, Inc.

2. In late October or November, 2006, Defendants became aware of a detailed, sworn affidavit testimony of a former Midlantic employee, Kenneth Vega in a federal lawsuit then pending in the Eastern District of New York, titled <u>Caprino et al v. Cohen & Slamowitz et al</u> (CV 021-4814) in which Mr. Vega, against his penal interest, stated that Midlantic's procedures regarding service of process from 1995 until February 2006 were grossly deficient and fraudulent, that the affidavits of service provided to C&S by Midlantic were substantively false, that the notarizations on the affidavits were improper, and that the purported signatures of the process servers were forged.

3. Rather than informing the consumers who were defendants in the tens of thousands of cases involving Affidavits of Service provided by Midlantic Process, Inc. or the state courts in which it

had filed its collection actions that it no longer had a good faith basis to believe in the accuracy, truthfulness and propriety of the Affidavits of Service it had filed, or the Attorney Affirmations referring to same, Cohen & Slamowitz concealed the information in order to facilitate collections against consumers, in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.*, and state laws.

4. On or about June 14, 2012, Defendants became aware that each and every Affidavit of Service filed by former Midlantic "process server", Alfred Smith, in particular, was falsified. To wit, on June 14, 2012, Mr. Smith – who is not a party to the instant action – testified that he had not signed <u>any</u> of the affidavits of service bearing his name and (forged) signature. Mr. Smith also testified to other material falsifications of these affidavits of service, including with regard to the times of service alleged therein.

5. Again, rather than informing the consumers who were defendants in the thousands of actions in which these falsified documents were filed, or the state courts in which it had filed these collection actions that it no longer had a faith basis to believe in the accuracy, truthfulness and propriety of the affidavits of service it had filed, or the attorney affirmations referring to same, Cohen & Slamowitz concealed the information in order to facilitate collections against consumers, in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.*, and state laws.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1692k(d) and 18 U.S.C. §§ 1961-68, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.. § 1367.

7. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

## PARTIES

*Named Plaintiffs*

9. Plaintiff Elizabeth Coble currently resides in Palmetto, Florida.

10. Ms. Coble previously resided in Manhattan, New York and had a default judgment taken against her in New York Civil Court in 2005 in an action titled <u>Discover Bank v. Coble</u> (Index: 36085/05).

11. The judgment against Ms. Coble was vacated and the action discontinued on November 3, 2010.

12. C&S was counsel to Discover Bank in said action, and the affidavit of service for the Summons and Complaint that C&S filed or caused to be filed was provided by Midlantic Process, Inc.

13. Ms. Coble is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

14. Plaintiff Milagros Harper currently resides in Yonkers, New York.

15. Mrs. Harper is the judgment debtor in a consumer collection action titled <u>Direct Merchants Credit Card Bank v. Harper</u> (Westchester Supreme)(Index: 21529/02)

16. C&S was counsel to Direct Merchants Credit Card Bank in said action, and the affidavit of service for the Summons and Complaint that C&S filed or caused to be filed, was provided by Midlantic Process, Inc.

17. Mrs. Harper is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

18. Plaintiff Dennis Harper currently resides in Yonkers, New York.

19. Mr. Harper, who is married to Milagros Harper, is the judgment debtor in a consumer collection action titled <u>Discover Bank v. Harper</u> (Westchester Supreme)(Index: 2661/02)

20. C&S was counsel to Discover Bank in said action, and the affidavit of service for the Summons and Complaint that C&S filed or caused to be filed, was provided by Midlantic Process, Inc.

21. Mr. Harper is a "consumer" as that term is defined in 15 U.S.C. § 1692a(3).

*Defendants*

22. Defendant Cohen & Slamowitz, LLC ("C&S") is a New York limited liability company with its principal place of business in Woodside, New York.

23. Defendant, a law firm, is regularly engaged in the business of collecting consumer debts alleged to be due to another, and is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

24. Defendant David Cohen, Esq. ("Defendant Cohen") is a natural person, and a principal of C&S. Defendant Cohen regularly collects consumer debts alleged to be due to another, and he is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

25. Defendant Mitchell Slamowitz, Esq. ("Defendant Slamowitz") is a natural person, and a principal of C&S. Defendant Slamowitz regularly collects consumer debts alleged to be due to another, and is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

26. Defendant Leandre John, Esq. (Defendant John) is an employee or partner of C&S and its "Managing Attorney". Defendant John regularly collects consumer debts alleged to be due to another, and is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

27. Defendant Crystal S.A. Scott, Esq. (Defendant Scott) was, until some time after this litigation was initiated, an employee of C&S and an associate attorney in that office. Defendant Scott regularly

collects consumer debts alleged to be due to another via, and is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6).

**COMMON FACTUAL ALLEGATIONS**

28. C&S is one of New York State's highest volume debt collection law firms.

29. C&S according to its own records filed 59,708 debt collection cases in 2005, 83,665 cases in 2006, 87,877 cases in 2007, and 80,873 cases in 2008.

30. C&S used Midlantic as its process server in tens of thousands of cases in which it obtained default judgments (hereafter, the Midlantic default judgments) between early 1992 and February 2006.

31. The structure of payment and amounts paid by C&S for "service of process" made proper service pursuant to the CPLR economically improbable and creates an inference that service was not properly made. Specifically:

   a. C&S paid Midlantic a flat fee of between $14.00 and $16.00 dollars per case for service of the summons and complaint, regardless of what form of service was performed and how many visits to a consumer's residence were made.

   b. These amounts were only due and owing when service was alleged to have been made. *i.e.* if Midlantic reported that service could not be made, Midlantic received nothing;

   c. Midlantic was also responsible for paying all mailing costs associated with service of C&S complaints;

   d. Midlantic's process servers were, predictably, paid only a fraction per file of what their employer, Midlantic was paid. Each process server was paid a flat fee of between $4.00 and $6.00 per file for which service was required.

   e. Process servers, likewise, received the same amount per file regardless of how many visits to a consumer's residence were made, and received no compensation if a summons and complaint could not be served.

   f. Process servers provided for their own transportation, and process server's compensation of $4 to $6 per file was inclusive of all expenses, *e.g.* the cost of maintaining and insuring the vehicle used to make service, gas, tolls, parking, etc.

   g. Thus, in a typical case involving "nail and mail" service (that is, affixation to the consumer's door on the third attempt at service, followed by sending the summons and complaint by regular mail) C&S paid Midlantic between $4.66 and $5.33 per purported trip to the consumer's residence (including, *inter alia*, not only attempting to serve the papers each time, but also speaking with neighbors regarding the consumer's place of

residence, confirming non-military service, etc.). Indeed, these numbers are actually inflated, as Midlantic was also to be responsible for mailing costs, as well.

h. The process server was, in turn, paid between $1.33 and $ 2.00 per purported trip to the consumer's house in a typical "nail and mail" case.

32. Given this financial arrangement, and the high percentage of its cases involving nail and mail service, C&S knew or should have known that the affidavits of service submitted to Courts on its behalf by Midlantic, and statements its own attorneys were making regarding service were improbable, as its financial arrangement with Midlantic made proper service according the CPLR financially non-viable for its process servers.

33. Any doubt C&S could have plausibly maintained regarding the incentives built into its arrangement with Midlantic was put to rest when C&S, Midlantic's owners (Vivian and Robert Schusteritsch) and former Midlantic process server Kenneth Vega were named as Defendants in an individual FDCPA action filed in United States District Court, EDNY, titled <u>Caprino et al. v. Cohen & Slamowitz, LLP et al.</u> (Index:CV-021-4814) that was subsequently settled.

34. By sworn affidavit dated October 30, 2006, Mr. Vega openly confessed to routinely making substantively false statements in affidavits of service filed on behalf of C&S, estimating that between March 1995 through February, 2006, he filed between 30 and 90 false affidavits a week with New York State Courts, and that C&S was counsel for the plaintiff in 75-80% of these cases. Vega Affidavit, attached hereto as <u>Exhibit 1</u>.

35. Mr. Vega's sworn affidavit states that his misdeeds, far from the anomalous acts of a "rogue" employee were part of Midlantic's standard operating procedure and were all directed by Midlantic and its owners, Robert and Vivian Schusteritsch, stating, inter alia, that "Robert and Vivian Schusteritsch provided me with all of the instructions and guidance on how to serve process."

36. As part of this Affidavit, Mr. Vega reviews some 92 affidavits of service and states that in each case, *inter alia:* his signature was signed by another; he did not appear in front of a notary for signature on any of the dates indicated; that he made no previous "attempts" at service; he never went to any residence or business listed more than one time; he did not make any of the mailings of the Summons and Complaint indicated on these affidavits of service; and that it was not his general practice to ask about a Defendant's military status.

37. Rather, Mr. Vega describes the procedure at Midlantic as one in which he would pick up a stack of Summons and Complaints twice a week from the Schusteritsch's home, and drive to the addresses provided by his employer. If he was not able to serve the defendant or a person of

suitable age and discretion, he would leave the documents at the address contained in the affidavit. He did not go more than once to any state court defendant's residence.

38. He would then phone in information about how and what time the papers had been "served", or give the Schusteritsch's this information the next time he went to their home to pick up additional Summons & Complaints.

39. Midlantic would then fabricate other dates on which he had supposedly made previous attempts at service, forge his signature, and falsely notarize the document.

40. Mr. Vega further states that these affidavits also falsely state that he had mailed a copy of the summons and complaint as required under the CPLR when he did not.

41. Mr. Vega states that he was told by Robert Schusteritsch that Midlantic used this method of "service" because if they did not they would "lose their business relationship with Cohen & Slamowitz".  Exhibit 1 at ¶9.

42. Since the filing of the initial Complaint in this action, subsequent discovery has confirmed that Midlantic's procedure for service of process was grossly fraudulent.  To wit, and without limitation, former Midlantic Process "server" Alfred Smith testified under oath at deposition that:

43. He never served process at night and that the (numerous) affidavits of service stating attempts to serve consumers in the evening were therefore false;\

44. He never served process early in the morning thus rendering those affidavits of service stating attempts to serve consumers in the morning false.

45. Any Midlantic affidavits of service purporting to bear his signature were forged, as he had never signed an affidavit of service (and by extension, any affidavit purporting to notarize his signature was also therefore fraudulent)He had never, prior to the date of deposition seen an affidavit of service. Furthermore, neither Mr. Vega nor Mr. Smith made any attempt to determine consumers' place of work prior to performing or purporting to perform "nail and mail" service.  According to sworn deposition testimony of David Cohen in a United States District Court, SDNY, titled Shepherd v. Cohen & Slamowitz (Index: 08-cv-6199)[1], C&S, has not undertaken any review of the Midlantic affidavits and has not notified the consumers against whom the affidavits were filed or the courts in which the Midlantic affidavits were filed of the Vega Affidavit and, more generally, that it no longer has a good faith basis to assert the veracity of the thousands of Midlantic affidavits on file, on the basis of which it regularly takes collection activity.

---

[1] In which Ms. Shepherd was represented by co-counsel for Plaintiffs in the instant action, Schlanger & Schlanger, LLP.  See Shepherd v. Law Offices of Cohen & Slamowitz, LLP, 668 F.Supp.2d 579 (SDNY 2009); and Shepherd v. Law Offices of Cohen & Slamowitz, 2010 WL 4922314 (SDNY 2010).

46. In connection with the instant litigation, C&S's 30(b)(6) witness, Defendant Leandre John, has described an "investigation" process that was so utterly cursory and inadequate in every regard that it amounts to no investigation at all.  For example, Mr. John testified that, during this "investigation" he never:

    a.  Spoke to Mr. Vega;

    b.  Spoke to Vivian Schusteritch (who notarized the affidavits bearing Mr. Vega's purported signature);

    c.  Spoke directly to Robert Schusteritch (but "may" have spoken to Mr. Schusteritch's attorney);

    d.  Spoke with any other Midlantic process server;

    e.  Spoke with any of the consumers identified by Mr. Vega as having been victims of the falsified affidavits;

    f.  Spoke with any consumers who, at the time of his investigation had pending Orders to Show Cause (*i.e.* OSC's whose return dates had not yet passed) alleging non-service.

    g.  Spoke with or attempted to identify the existence of any of the "neighbors" reference in Mr. Vega's affidavits;

    h.  Never opened up a file regarding the issue;

    i.  Never created a word document or pdf regarding the issue;

    j.  Never sent an email or any other correspondence regarding the issue;

47. Rather, Mr. John determined that, at the time of his "investigation" there were approximately 100 Orders to Show Cause calendared in a several week period, that approximately 70 of these orders involved Midlantic Process, Inc, and approximately 20 involved Mr. Vega.  Mr. John posited that these numbers were roughly proportionate in some sense to other process serving companies, and on that basis concluded that there was no problem.

48. Of course, Mr. John's "investigation", such as it was, even assuming it occurred, did not relate in any way to the actual allegations in Mr. Vega's affidavit, *e.g.* that his signature and the notarization was forged, that his statements regarding conversations with neighbors were fiction, that he affixed summons and complaints to consumers' doors without making prior attempts, etc.

49. Mr. John also testified that C&S did not provide the Vega Affidavit even to those consumers with pending Orders to Show Cause involving allegations of non-service by Midlantic in general or Mr. Vega in particular.

50. C&S likewise has not undertaken any investigation at all regarding Alfred Smith's testimony that each and every affidavit bearing his name is forged, that each notarization on the affidavits bearing his name is falsified, and that each of the affidavits of service alleging he visited a

property early in the morning or in the evening (which upon information and belief is virtually all of the nail and mail affidavits bearing his name) is substantively false regarding the time of attempted service.

51. Rather, Mr. John claims that Mr. Smith seemed "agitated" and "angry" during his June 14, 2012 deposition and that therefore his testimony was untruthful.

52. In short, C&S has failed to investigate in any meaningful sense, or to notify courts or consumers despite the fact that it has an ongoing obligation to advise the Court and its adversaries if it becomes aware that it no longer has a good faith basis for its allegations.

53. Indeed, since learning of the issue, C&S has subsequently, repeatedly filed affirmations sworn to by its attorneys which it falsely state that C&S has a good faith belief in the accuracy and propriety of these affidavits.

54. These C& S affirmations include but are not limited to affirmations submitted in support of default judgments, sworn to by Defendant Slamowitz or Defendant Cohen, stating that the deponent "subscribes and affirms under penalties of perjury. . . that pursuant to the Affidavit(s) of Service of the process server on the file herein, the defendant(s) were served. . ."

55. C&S also submits similar false sworn statements in cases in which a consumer challenges service including that of Plaintiff Coble as described below.

56. Upon information a belief, Defendant Scott's sworn statement in opposition to Ms. Coble's *pro se* motion (set forth below) is a stock response that is regurgitated by C&S and its attorneys in many cases in which a pro se debtor challenges service, including many cases involving Midlantic Affidavits.

57. Since becoming aware of the Vega Affidavit, Defendants also continue to take a wide variety of collection actions with regard to cases involving Midlantic Affidavits, including but not limited to:

> a. issuing Income Executions that state that judgments involving Midlantic Affidavits were "duly entered", and garnishing wages based on same;
>
> b. issuing information subpoenas to banks on the basis of these judgments, and levying bank accounts based on same;
>
> c. sending out dunning letters to consumers;
>
> d. making dunning calls to consumers.

58. In each of these instances, including instances involving allegations of nail and mail service by Alfred Smith and Kenneth Vega, C&S makes no reference to the fact that the it no longer can maintain a plausible, good faith belief in the validity of the affidavit of service upon which judgment was predicated.

59. Defendants' affirmative misrepresentations and omissions with regard to the Midlantic affidavits and its good faith belief in their propriety constitute an unfair and deceptive collection practice.

60. Since the Alfred Smith deposition, C&S has continued to enforce judgments involving Midlantic generally andhas continued to enforce judgments in cases involving Mr. Smith, particular.   C&S has done so without notifying either consumers or the courts that it no longer has a good faith basis to believe that the Smith Affidavits of Service or Midlantic affidavits more generally are true, accurate, properly signed and properly notarized.

### PLAINTIFFS' EXPERIENCES
### (ELIZABETH COBLE)

61. In July 2005, C&S, on behalf of Discover Bank, filed a lawsuit against named plaintiff Elizabeth Coble in New York Civil Court, titled <u>Discover Bank v. Coble</u> (Index: 36085/05), alleging that Ms. Coble owed $10,272.61 plus attorney's fees of $2,054.52, plus costs and interest.

62. Sometime in August, 2005, C&S or an agent acting on its behalf filed an affidavit of service in <u>Discover Bank v. Coble</u>, which was provided by Midlantic.

63. Specifically, the affidavit was purportedly sworn to and signed by "Alfred Smith, Lic. 1129832" and purportedly notarized by Midlantic owner, Vivian E. Schusteritsch.  The affidavit of service states "Midlantic Process, Inc.  P.O. Box 151, Wantagh, N.Y."

64. The affidavit of service alleges that Service was made by serving "John Doe", purportedly a tenant residing at Ms. Coble's New York address, 338 East 53rd, Apt. 2D, New York, NY 10022-5254.

65. The Affidavit of Service alleged that two prior attempts at service had been made on 8/2/05 and 8/3/05, respectively, and that the process server inquired with "John Doe" as to whether Ms. Coble was in the military and received a negative reply.

66. The Affidavit of Service alleged that "deponent deposited in a post office, official depository under the exclusive care and custody of the United States Postal Service within the State of New York a true copy(s) of the SUMMONS & COMPLAINT in the above entitled action, properly enclosed and sealed in a post-paid wrapper marked PERSONAL & CONFIDENTIAL, addressed to the said defendant" at the New York address listed above, via "Certificate of Mailing".

67. A default judgment for $10,670.52 was entered against Ms. Coble on December 07, 2005.

68. The default judgment contains a sworn statement by Mitchell Slamowitz of C&S,  "that pursuant to the Affidavit(s) of Service, of the process server on the file herein, the defendant(s) were served, but have since failed to appear, answer or move herein, and the time to do so has expired so that Plaintiff is entitled to a judgment by default."

69. Ms. Coble became aware of the New York judgment for the first time in mid-2009. Specifically, she was contacted in January, 2009 by a Florida collection lawyer, Stanley B. Erskin, Esq., who was attempting to collect from Ms. Coble on the basis of a purported Florida state court judgment against her in an action supposedly titled "<u>Discover Bank v. Coble</u>".

70. As no such Florida judgment existed, Ms. Coble complained to the Florida Attorney General and the Florida Bar Association in early 2009.

71. In response to the Florida Bar Association inquiry, Mr. Erskine produced a copy of the judgment against Ms. Coble in New York Civil Court, in <u>Discover Bank v. Coble</u> (Index: 36085/05), claiming that a clerical error had led him to believe that the judgment was entered in Florida. This was the first time Ms. Coble learned of the judgment or that a case had been filed against her.

72. Ms. Coble, representing herself pro se, moved to vacate the judgment in <u>Discover Bank v. Coble</u> by Order to Show Cause on September 7, 2010 alleging that she had never been served.

73. C&S opposed the motion, filing an "Affirmation In Opposition To Order To Show Cause" sworn to by C&S associate attorney Crystal S.A. Scott, which stated:

> In Defendant's Order to Show Cause, Defendant alleges that she was never served with the Summons & Complaint that were filed in this action. Plaintiff submits that this statement is patently untrue. Plaintiff respectfully points out that, as set forth in the Affidavit of Service, Defendant was properly served in strict accordance with the directives of CPLR § 308(4). Moreover, the Affidavit of Service states that true copies of the Summons and Complaint were properly mailed to Defendant at Defendant's address.

74. By Order and Decision dated 10/5/10, New York Civil Court Judge, the Hon. Peter Moulton, ordered a "hearing on the issue of service and for final disposition of the motion."

75. Ms. Coble subsequently retained Schlanger & Schlanger, LLP as counsel in October, 2010. It was at this time that Ms. Coble first became aware of the existence of the Vega Affidavit and the unfair and deceptive acts complained of herein.

76. By letter dated October 25, 2010, counsel for Ms. Coble informed C&S that Ms. Coble had retained counsel; that Ms. Coble intended to fly in from Florida for the hearing ordered by the Court, and that the process server's attendance was required.

77. On November 3, 2010, the judgment was vacated and discontinued by stipulation of the parties.

**PLAINTIFFS' EXPERIENCES**
**(MILAGROS HARPER)**

78. On December 16, 2002, C&S, on behalf of Direct Merchants Credit Card Bank, filed a consumer collection lawsuit against named plaintiff Milagros Harper in New York Supreme Court, County

of Westchester, titled <u>Direct Merchants Credit Card Bank v. Harper</u> (Index: 21529/02), alleging that Mrs. Harper owed Plaintiff $4,289.90 and $857.98 in attorneys fees, plus interest and costs.

79. On January 21, 2003, C&S or an agent acting on its behalf filed an affidavit of service in <u>Direct Merchants Credit Card Bank v. Harper</u> (Index: 21529/02), which was provided by Midlantic.

80. Specifically, the affidavit was purportedly sworn to and signed by "Kenneth Vega" and purportedly notarized by Vivian E. Schusteritsch. The affidavit of service states "Midlantic Process, Inc.. P.O. Box 151, Wantagh, N.Y." Ms. Schusteritsch is one of the principals of Midlantic.

81. The affidavit of service alleges that Service was made by serving Mrs. Harper by "nail and mail" service at 824 Bronx River Road, Apt. 6A, Bronxville, New York.

82. The Affidavit of Service alleged that two prior attempts at service had been made on 12/20/02 and 12/23/02, respectively, and that the process server inquired with "tentant" [sic], "Sid Johnson" as to whether Mrs. Harper was in the military and received a negative reply.[2]

83. The Affidavit of Service alleged that "deponent deposited in a post office, official depository under the exclusive care and custody of the United States Postal Service within the State of New York a true copy(s) of the SUMMONS & COMPLAINT in the above entitled action, properly enclosed and sealed in a post-paid wrapper marked PERSONAL & CONFIDENTIAL, addressed to the said defendant" at the New York address listed above, via "Certificate of Mailing".

84. A default judgment for $5,050.31 was entered against Mrs. Harper on December 07, 2005. The default judgment contains a sworn statement by Mitchell Slamowitz of C&S, "that the Defendant(s) have failed to appear, answer or move herein, and the time to do so has expired" and that "pursuant to the affidavits of service on file herein, deponent alleged that defendant(s) are not in the military service".

85. Mrs. Harper first became aware of the existence of the Vega Affidavit and the unfair and deceptive acts complained of herein in August, 2010 upon meeting with counsel.

86. Mrs. Harper has been dunned by Defendants on the judgment during the year prior to the filing of the Complaint. For example, Defendants caused the Westchester County Sheriff's Civil Unit to send her a notice of income execution dated July 8, 2010.

87. The copy of the income execution prepared and filed by Defendants with the Sherriff and forwarded to Mrs. Harper, is dated June 11, 2010. It describes the judgment as "duly entered" and commands Mrs. Harper to pay Defendants the amount of the judgment plus interest and costs

---

[2] The Affidavit of Service contradicts itself inasmuch as it alleges that Mr. Vega was "unable, with due diligence to find Defendant or a person of suitable age and discretion" but also asserts that the process server spoke with a "Sid Johnson; Tenant" at said premise regarding whether or not Mrs. Harper was in the military.

in installments amounting to 10% of her gross wages (with payments to be made through the Sheriff's office) and notifies her that if she fails to commence payments within 20 days, the income execution will be served on her employer and the payment subtracted from her paycheck. The income execution contains notices regarding certain rights of judgment debtors, and bears Defendant David Cohen's signature.

88.  Based upon that income execution, Defendants collected and retained 10% of Ms. Harper's gross wages with regard to several paychecks.

## PLAINTIFF'S EXPERIENCES
## (DENNIS HARPER)

89. On February 20, 2002, C&S, on behalf of Discover Bank, filed a consumer collection lawsuit against named plaintiff Dennis Harper in New York Supreme Court, County of Westchester, titled <u>Discover Bank v. Harper</u> (Index:  02-02661), alleging that Mr. Harper owed Plaintiff $12473.87 and $2494.77 in attorney's fees, plus interest and costs.

90. On March 11, 2002, C&S or an agent acting on its behalf filed an affidavit of service in <u>Discover Bank v. Harper</u> (Index:  02-02661), which was provided by Midlantic.

91. Specifically, the affidavit was purportedly sworn to and signed by "Kenneth Vega" and purportedly notarized by Vivian E. Schusteritsch.  The affidavit of service states "Midlantic Process, Inc..  P.O. Box 151, Wantagh, N.Y."   Ms. Schusteritsch is one of the principals of Midlantic.

92. The affidavit of service alleges that Service was made by serving Mr. Harper by "nail and mail" service at 824 Bronx River Road, Apt. 6A, Bronxville, New York.

93. The Affidavit of Service alleged that two prior attempts at service had been made on 2/15/02 and 2/16/02, respectively, and that the process server inquired with "Ron Doe; Neighbor" as to whether Mr. Harper was in the military and received a negative reply.

94. The Affidavit of Service alleged that "On 2/28/02, deponent deposited in a post office, official depository under the exclusive care and custody of the United States Postal Service within the State of New York a true copy(s) of the SUMMONS & VERIFIED COMPLAINT in the above entitled action, properly enclosed and sealed in a post-paid wrapper marked PERSONAL & CONFIDENTIAL at the aforementioned last known address. . ."

95. A default judgment for $12,891.37 was entered against Mr. Harper on October 21, 2002.

96. The default judgment contains a sworn statement by Mitchell Slamowitz of C&S,  "that the Defendant(s) have failed to appear, answer or move herein, and the time to do so has expired"

and that "pursuant to the affidavits of service on file herein, deponent alleged that defendant(s) are not in the military service"

97. Mr. Harper was not served with the Summons and Complaint in this case by affixation to his door followed by regular mail, nor by any other method.

98. Mr. Harper was not aware of this lawsuit until August 2010, when he learned that many New Yorkers were victims of false Midlantic affidavits filed by Defendants and, as a result, examined the online court files made available by the Westchester County Clerk to see if he, too, was a victim.

99. Mr. Harper first became aware of the existence of the Vega Affidavit and the unfair and deceptive acts complained of herein in August, 2010 upon meeting with counsel.

100. C&S has dunned Mr. Harper subsequent to the initial filing of this action. Specifically, and without limitation, C&S sent Mr. Harper a letter dated March 2, 2011 that referenced the Index number of the case in which the default judgment had been taken, listed the "Balance Due As Of March 02, 2011" as "$22,599.11", and offered to accept a sum of $7,909.69 as full and final settlement. The letter characterized this offer as a "savings of 65% off" and a "TAX SEASON SPECIAL DISCOUNT".


## CLASS ACTION ALLEGATIONS

101. Plaintiff brings this action on behalf of herself and all other similarly situated people. Plaintiffs seek to represent the following  class and subclass  defined as follows:

    a. The Class:

      All persons who have been sued in a consumer collection action commenced in New York State in which C&S represented the state court plaintiff; and the affidavit of service was signed and/or notarized by Midlantic or any owner, agent or employee of Midlantic.

    b. The Vega, Nail and Mail, Actual Damages Sub-Class:

      All Class Members (i.e. all persons meeting the class definition set forth above, in subsection (a)) who, in addition, meet the following criteria:
        i.   The affidavit of service filed in the state court collection case alleges service pursuant to CPLR 308(4) (i.e. "nail and mail" service) and was purported to be signed by Midlantic process server Kenneth Vega;
        ii.  C&S took a default judgment; and
        iii. C&S collected money after October 30, 2006 from the consumer by means of any device set forth in Article 52 of New York's Civil Practice Law and Rules ("Money Judgments – Enforcement"), including but not limited to wage garnishment and bank restraint.

c. The Smith, Nail and Mail, Actual Damages Sub-Class:

All Class Members (i.e. all persons meeting the class definition set forth above in subsection (a)) who, in addition, meet the following criteria:

    i. The affidavit of service alleges service pursuant to CPLR 308(4) (i.e. "nail and mail" service) and was purported to be signed by Midlantic process server Alfred Smith;

    ii. C&S took a default judgment; and

    iii. C&S collected money after June 14, 2012 from the consumer by means of any device set forth in Article 52 of New York's Civil Practice Law and Rules ("Money Judgments – Enforcement"), including but not limited to wage garnishment and bank restraint.

102.      Excluded from the Class and Subclasses are anyone employed by counsel for Plaintiff in this action; and any Judge to whom this case is assigned as well as his or her immediate family and staff.

103.      Excluded from the Class and Subclasses are Gloria Shepherd, Frank Caprino and Kristina Armstrong Boyle.

104.      This action has been brought and may properly be maintained on behalf of the Class proposed above under the criteria of Federal Rule of Civil Procedure Rule 23.

105.      <u>Numerosity</u>. Members of the Class are so numerous that their individual joinder herein is impracticable. Upon information and belief, C&S filed tens of thousands of Midlantic affidavits in case in which defaults were obtained. Indeed, according to Mr. Vega's affidavit he personally was responsible for the filing of tens of thousands of such affidavits. Mr. Vega was, of course, just one of Midlantic's process servers. Although the exact number of Class members and their addresses are unknown to Plaintiffs, they are readily ascertainable from Plaintiffs' records.

106.      <u>Existence and predominance of common questions</u>. Common questions of law and fact exist as to Plaintiffs and all members of the Class and predominate over questions affecting only individual Class members. These common questions include:

(a)      Whether Defendants, by act or omission, falsely represented to the class and New York courts that the Midlantic affidavits were true and proper after it lacked a good faith basis for this assertion.

(b)      Whether Defendants are engaged in unfair and/or deceptive debt collection practices in violation of 15 USC § 1692 *et seq.*, NYGBL § 349 and/or NYJL § 487.

(c)     Whether Plaintiffs and the other Class members are entitled to statutory damages, costs and attorneys fees under the FDCPA.

(d)     Whether Plaintiffs and the other Class members are entitled to actual damages, costs and attorneys fees under the FDCPA and state laws.

(e)     Whether Plaintiffs and the other Class members are entitled to notice regarding the contents of the Vega Affidavit and Smith testimony under the FDCPA and state laws.

107.     <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the Class because, among other things, Plaintiffs had were sued in a consumer collection action in New York State in which (1) C&S represented the Plaintiff; (2) the affidavit of service was signed and/or notarized by an employee, owner or agent of Midlantic; and (3) C&S did not notify Plaintiffs or the Courts in which the consumer collection actions against Plaintiffs herein were filed of the fact that it no longer had a good faith basis to belief in the accuracy and propriety of the Affidavit of Service it had filed or the sworn statements of Defendants regarding same.

108.     <u>Adequacy</u>. Plaintiffs are an adequate representative of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

109.     <u>Superiority</u>. The class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs. The damages suffered by each individual Class member may be limited. Damages of such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Further, it would be virtually impossible for the members of the Class effectively to individually redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

110.     In the alternative, the Class may be certified because:

(a)     the prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to

individual Class members which would establish incompatible standards of conduct for Defendants;

(b)     the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the members of the Class as a whole.

## TOLLING

111.     _Fraudulent Concealment Tolling_: The FDCPA's one year statute of limitations, which might otherwise apply to bar Plaintiffs' claims should be tolled by Defendants' knowing and active concealment of the fact that the Midlantic Affidavits and the attorney affirmations referencing the Midlantic Affidavits were false and improper.   Plaintiffs could not have discovered, even upon reasonable exercise of diligence, that the MidlanticAffidavits and related attorney affirmations were false and improper. As this Court has previously held in this case, "continued collection legitimize[d] those judgments and conceal[ed] the fact that C & S can no longer maintain a good faith belief in their validity."   Coble v. Cohen & Slamowitz, LLP, 824 F.Supp.2d 568, 571 (S.D.N.Y. 2011).  Indeed, in those instances where a consumer, acting pro se, raised lack of service as a defense, Defendants affirmatively re-asserted the validity of the Midlantic Affidavits it knew to be false in sworn affirmations.   Defendants kept Plaintiffs ignorant of vital information essential to the pursuit of their claims. Thus, as this Court has already found,  "because plaintiffs had no reason to doubt the authenticity of the Midlantic affidavits until they discovered the Vega Affidavit, defendants' conduct prevented plaintiffs from discovering their claims under the FDCPA in a timely manner. . . continuing to enforce the collections actions based on those affidavits, defendants intentionally kept plaintiffs ignorant of information essential to the pursuit of their claims"  Id. at 572.

112.     _Estoppel_: Defendants knowingly, affirmatively and actively concealed the falsity and impropriety of the Midlantic Affidavits and related attorney affirmations from consumers. Defendants did not inform the Courts or consumers after November 2006 (when Defendants learned of the Vega Affidavit) or after June 14, 2012 (when Defendants learned of the Smith testimony), that Defendants did not have any reasonable basis to believe the Midlantic Affidavits

and related attorney affirmations were true and, to the contrary, had every reason to believe they were false.  In those instances where a consumer, acting *pro se*, raised lack of service as a defense, Defendants affirmatively re-asserted the validity of the Midlantic Affidavits it knew to be false in sworn affirmations without providing the Vega affidavit or Smith testimony to the affected consumer.  In this way, Defendants intentionally kept Plaintiffs ignorant of vital information essential to the pursuit of their claims.  Based upon the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

113.     *Discovery Rule Tolling.*  Plaintiffs and members of the class could not have discovered through the exercise of reasonable diligence that the Defendants knew or should have known that service of process on them was invalid or that pleadings filed based on presumptively invalid service were improper within the time period of any applicable statute of limitations. Among other things, Plaintiffs did not know and could not have known that the Defendants had initiated a scheme for payment for service of process that was facially insufficient to yield a good faith belief that service was properly made or that Defendants had or could have acquired evidence that process servers acting as its agents had falsified affidavits of service.   Plaintiffs could not have discovered, for example, that Kenneth Vega had made sworn statements in a legal action that implicated the validity of all of the affidavits of service which were filed with his signature, as well as the procedures used at Midlantic, more generally, or that Alfred Smith had or would make similar sworn statements.

## CAUSE OF ACTION
### (FDCPA, 15 U.S.C. § 1692 *et seq.)*
### *(Asserted On Behalf of The Class Including The Actual Damages Subclasses)*

114.     Plaintiffs hereby restate, reallege, and incorporate by reference all

foregoing paragraphs.

115.     Congress enacted the Fair Debt Collection Practices Act to stop "the use

of abusive, deceptive and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

116.     A debt collector may not "use any false, deceptive, or misleading

representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Such a prohibition includes the false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A). Such a prohibition also includes the "use of any false

representation or deceptive means to collect or attempt to collect any debt." 15 U.S.C. §1692e(1 0).

117.     A debt collector may not "use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

118.     Nor may a debt collector "engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." U.S.C. § 1692d.

119.     Defendants violated the FDCPA, including without limitation, §§ 1692d, 1692e, 1692e(2)(A), 1692e(10), and, in the alternative, 1692(f) by representing to consumers and the courts through act and/or omission that the Midlantic Affidavits and related attorney affirmations were accurate, true and proper (and/or that Defendants had a good faith belief in their accuracy, propriety and truthfulness) after November 2006, when Defendants no longer had or could plausibly maintain such a belief.

120.     Defendants violated the FDCPA, including without limitation, §§ 1692d, 1692e, 1692e(2)(A), 1692e(10), and, in the alternative, 1692(f), by continuing to collect the debts at issue after November 2006, without informing or attempting to inform consumers that the Midlantic Affidavits and related attorney affirmations were false, and/or that Defendants no longer had a reasonable, good faith belief in their accuracy, propriety and truthfulness.

121.     As a direct and proximate result of Defendants' violations of the FDCPA, Plaintiffs have sustained statutory damages, actual damages, costs and attorneys' fees.

### SECOND CAUSE OF ACTION
**NYGBL § 349 (Deceptive Acts and Practices Unlawful)**
*(Asserted On Behalf Of The Actual Damages Subclass Only)*

122.     Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

123.     Each of the deceptive acts and practices set forth above, including but not limited to each deceptive act and practice set forth in the First Cause of Action was committed in the conduct of business, trade, commerce or the furnishing of a service in this state and constituted a violation of §349 independent of whether it also constituted a violation of any other law.

124.     Each of these actions was consumer oriented and involves misleading conduct that is recurring and has a broad impact upon the public. Specifically, and without limitation, by:

a.     representing to consumers and the courts through act and/or omission that the Midlantic Affidavits and related attorney affirmations were accurate, true and proper (and/or that Defendants had a good faith belief in their accuracy, propriety and truthfulness) after

November 2006, when Defendants no longer had or could plausibly maintain such a belief; and

b. by continuing to collect the debts at issue after November 2006, without informing or attempting to inform consumers that the Midlantic Affidavits and related attorney affirmations were false, and/or that Defendants no longer had a reasonable, good faith belief in their accuracy, propriety and truthfulness.

Defendants have committed deceptive acts and practices that impacts tens of thousands of consumers.

125.    Indeed, Kenneth Vega alone estimated that he has served between 15,000 and 45,000 affidavits of service on behalf of Midlantic (i.e. 30-90 affidavits per week) from 1996 through 2006, and Midlantic had anywhere from two to six process servers working for it at any given time between 1992 and 2006, with approximately 70% to 80% of its workload consisting of C&S cases.

126.    Plaintiff notes in this regard that a court-ordered sample of Defendants files, containing only Midlantic-implicated judgments obtained in one month of 2001 through 2006, respectively, contained well over 5000 case files.

127.    Each of Defendants' deceptive acts, outlined above, by their nature, involve a material misrepresentation.

128.    As a result of these violations of NYGBL §349, Plaintiffs have, actual damages, in the amount collected by C&S from the consumer, post-judgment, since October 30, 2006 with regard to the Vega, Nail and Mail Subclass, and since June 14, 2012 with regard to the Smith, Nail and Mail Subclass, attorney's fees and costs.

### THIRD CAUSE OF ACTION
**Judiciary Law § 487**
*(Asserted On Behalf Of The Actual Damages Subclass Only)*

129.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

130.    Defendants have been guilty of deceit of both the state courts and the Plaintiffs, by:

a. representing to consumers and the courts through act and/or omission that the Midlantic Affidavits and related attorney affirmations were accurate, true and proper (and/or that Defendants had a good faith belief in their accuracy, propriety and truthfulness) after November 2006, when Defendants no longer had or could plausibly maintain such a belief; and

b. by continuing to collect the debts at issue after November 2006, without informing or attempting to inform consumers that the Midlantic Affidavits and related attorney affirmations were false, and/or that Defendants no longer had a reasonable, good faith belief in their accuracy, propriety and truthfulness.

131. These acts were intentional and, indeed, were an integral part of Defendants strategy to collect on tens of thousands of judgments premised upon problematic affidavits.

132. These false representations were made under oath inasmuch as every judgment obtained by Defendants includes an attorney affirmation referencing the affidavit of service and, in many cases subsequent false representations were made in signed post-judgment instruments such as income executions, bank account levies, and orders to show cause in opposition to motions to vacate.

133. With regard to all underlying state cases, Defendants were under a continuing obligation with regard to each underlying state court case pursuant to *22 NYCRR 130-1.1*.

134. As a result of these false representations, Plaintiffs have suffered damages including but not limited to the amount Defendants have collected, post-judgment, from October 30, 2006 to date with regard to the Vega, Nail and Mail Subclass, and from June 14, 2012 with regard to the Smith, Nail and Mail Subclass.

135. Defendants false representations cannot remotely be described as isolated or inadvertent. Rather, as described above, these false representations are part of a larger, recurring policy and practice that is designed to hide the problematic nature of the Midlantic Affidavits, and increase C&S's profits.

136.     Plaintiffs are entitled to treble his damages as a result of Defendants' violations of Judiciary Law § 487, reasonable attorney's fees, and costs.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment**
*(Asserted On Behalf Of The Actual Damages Subclass Only)*

137.     Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

138.     By continuing to collect the debts at issue after November 2006 with regard to the Vega Nail and Mail Subclass, and after June 14, 2012 with regard to the Smith Nail and Mail Subclass, without informing or attempting to inform consumers that the Midlantic Affidavits and related attorney affirmations were false, and/or that Defendants no longer had a reasonable, good faith belief in their accuracy, propriety and truthfulness, Defendants benefitted.

139.     Specifically, on information and belief, C&S was compensated in the underlying state court based, as a percentage or otherwise, upon the dollar amounts it collected.

140.     These monies were collected at Plaintiffs' expense.

141.     Restitution is proper, as good conscience and equity require that these monies, collected on judgments that C&S knew or should have known were premised on affidavits the reliability of which could no longer be assumed or asserted in good faith, and collected without notifying consumers of same, be returned.

WHEREFORE, Plaintiffs and members of the class request the following relief, jointly and severally as against all defendants:

**A.**  An order certifying this case as a class action under Fed. R. Civ. P. 23;

**B.**  A judgment declaring that Defendants have committed the violations of law alleged in this action;

**C.**  An order directing Defendants to cease engaging in debt collection practices that violate the FDCPA, NYGBL § 349 and NYJL § 487;

**D.**  An order directing Defendants to provide each class member against whom a case is currently pending or against whom a default judgment was taken with a copy of the affidavit of service filed in their action, a copy of the Vega Affidavit, the relevant portions of the Smith deposition transcript, and

a letter explaining that this information may or may not provide a defense or grounds for vacatur and dismissal in the action against them.

**E.** Statutory and actual damages pursuant to the FDCPA;

**F.** Actual and punitive damages pursuant to NYGBL § 349;

**G.** Actual and treble damages pursuant to NYJL § 487;

**H.** Restitution based on Plaintiffs' Fourth Cause of Action for Unjust Enrichment.

**I.** An order awarding disbursements, costs, and attorneys' fees pursuant to the FDCPA, NYGBL § 349, and NYJL § 487.

**J.** Injunctive relief consistent with equity.

**K.** Such other and further relief that may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated: January 4, 2013

Respectfully Submitted,

Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
9 East 40th Street, Suite 1300
New York, New York 10016
Ph: 914-946-1981
Fax: 914-946-2930
daniel@schlangerlegal.com

Gary Klein, Esq.
(*admitted pro hac vice*)
Klein Kavanagh Costello LLP
85 Merrimac Street, 4th Floor
Boston, MA 02114
Ph: 617-357-5031
Fax: 617-357-5030
klein@kkcllp.com

*Counsel for Plaintiffs*

# EXHIBIT 1

UNITES STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____ X

Frank Caprino and                     Plaintiffs,
Kristina Armstrong Boyle

Docket No. CV-021 - 4814

-against-

Cohen & Slamowitz, LLP,                              Affidavit of Kenneth Vega
Robert Schusteritsch, Vivian
Schusteritsch and Kenneth
Vega,

                              Defendants.
_____ X

STATE OF NEW YORK)
                 )
COUNTY OF SUFFOLK) ss.:

Kenneth Vega, being duly sworn, deposes and says:

1. I am a Defendant in the above-captioned matter and am fully familiar with the facts
and circumstances of the case.

2. I worked for Midlantic Process Inc. (hereinafter "Midlantic") from in or about March,
1995 until February, 2006. My job for Midlantic was a process server and this was my first
employer in this field. Prior to working for Midlantic, I had no knowledge about how process
was supposed to be served. Robert and Vivian Schusteritsch provided me with all of the
instructions and guidance on how to serve process.

3. Upon information and belief, at all times relevant herein, Midlantic was owned and
operated by Vivian E. Schusteritsch and/or Robert Schusteritsch.

l

4. Upon information and belief, Robert Schusteritsch and Vivian Schusteritsch operated Midlantic from their residence at 3383 Stratford Rd, Wantagh, New York 11793.

5. On the direction of Midlantic, Robert Schusteritsch and Vivian Schusteritsch, I served process of Summons and Complaints in lawsuits filed in the following Courts: Supreme Court-Suffolk County; Supreme Court-Nassau County; Supreme Court-Westchester County; First District Court Suffolk County (Ronkonkoma); Fifth District Court Suffolk County (Ronkonkoma) Fourth District Court Suffolk County (Hauppauge); Sixth District Court Suffolk County (Patchogue); Second District Court Suffolk County (Deer Park); Third District Court Suffolk County (Huntington Station); Nassau County District Court; City Court of the City of Rye; City Court of the City of White Plains; and City Court of the City of New Rochelle.

6. I was responsible for serving approximately 15-30 Summons and Complaints (or other papers) per day, 2-3 days per week, on the direction of Midlantic, Robert Schusteritsch and Vivian Schusteritsch. Of those 30-90 cases per week, I estimate that approximately 75-80% were cases in which co-defendant Cohen & Slamowitz (f/k/a Upton, Cohen & Slamowitz) was the attorney for the Plaintiff. Although the workload provided by Cohen & Slamowitz to Midlantic varied from year to year, the majority of the cases I served for Midlantic were for Cohen & Slamowitz.

7. I was paid by Midlantic between $4.00 and $10.00 for each service.

8. Upon the direction of Robert Schusteritsch, the procedure I was required to follow for serving process was as follows: two times per week, I would go to the Schusteritsch's home and pick up from them a batch of Summons and Complaints to be served along with the addresses at which they were to be served. I would then drive to the addresses that the Schusteritsch's gave me and either serve the Defendant in that case or a person of suitable age and discretion, or leave the documents at the Defendant's residence or business. I would then either telephone the

2

Schusteritschs and inform them of how and at what time the papers had been served, or I would provide them said information upon my next visit to their residence. Upon information and belief and from a review of the affidavits of service referred to herein, the Schusteritschs, or someone at their direction, would then create an affidavit of service based upon the date that I told them I had served or posted the documents at the residence. On information and belief, they would then fabricate other dates that I supposedly made attempts to serve the Defendants, when in fact I did not attempt to serve defendants more than one time. Generally, I would not speak to neighbors about whether the Defendant was in the military, although there were occasions through the years that I did. Upon information and belief and from a review of the affidavits of service referred to herein, the Schusteritiches, or someone at their direction, also wrote on the affidavits of service that I had mailed a copy of the Summons and Complaint to a particular defendant, while I had not in fact done so. The Schusteritschs or someone at their direction then signed the affidavits of service with what is purported to be my signature. I did not attempt to find alternative addresses for the defendants, nor did I attempt to find the defendants' place of employment. A review of the affidavits of service referred to herein also seems to reflect that Vivian Schusteritsch notarized the signatures which are purported to be mine, but are not.

9. I was instructed to perform service in this manner by Robert Schusteritsch and Vivian Schusteritsch. Robert Schusteritsch informed me that they were under pressure from the lawyers for whom they were serving the documents to return an affidavit of service quickly. Robert Shusteritsch also informed me that if service was not made in the above referenced manner, Midlantic would lose their business relationship with Cohen & Slamowitz. Robert Schusteritsch also informed me that it would not be cost-effective for anyone to go to a defendant's residence more than once to attempt to serve the documents. As such, I did not go to a defendant's residence more than one time.

3

10. I am a single father of a five (5) year old little girl and I feared that if I did not perform the services in the manner required by Midlantic and Cohen & Slamowitz that I would lose my job and custody of my daughter because I would be unable to support her.

### Caprino Affidavit of Service

11. I have reviewed the Affidavit of Service in the matter of *Household Bank (SD), N.A. v. Frank Caprino* under Index/Docket number CEC 05-0001780 in the Suffolk County First District Court, Ronkonkoma (the "Caprino Affidavit of Service").

12. The Caprino Affidavit of Service contains false statements.

13. I did not sign the Caprino Affidavit of Service.

14. I did not appear in front of a notary on February 3, 2005 to sign the Caprino Affidavit of Service.

15. I cannot recall whether I left a Summons and Complaint at 47 Ridgeway Boulevard, Bay Shore, New York on January 29, 2005. I do not have any documentation showing whether I left any documents at 47 Ridgeway Boulevard, Bay Shore, New York on January 29, 2005.

16. On January 27, 2005 and January 28, 2005, I did not attempt to serve a Summons and/or Complaint on Frank Caprino at 47 Ridgeway Boulevard, Bay Shore, New York. I did not go to 47 Ridgeway Boulevard, Bay Shore, New York more than one time.

17. On February 3, 2005, I did not mail a Summons and/or Complaint to Frank Caprino via "certificate of mailing" nor did I mail a Summons and Complaint to Frank Caprino at all.

18. I did not speak to anyone at 43 Ridgeway Ave. Bay Shore, New York about Frank Caprino. I don't recall speaking to any of Frank Caprino's neighbors.

19. I do not recall inquiring of anybody about the military status of Frank Caprino. It was not my general policy to speak to anyone at about the military status of a defendant.

4

20. I did not attempt to determine Frank Caprino's place of employment, nor did I attempt to locate any other alternative location to make service by personal delivery upon Mr. Caprino.

21. On information and belief the Caprino affidavit of service was created using the procedure described in paragraph 8 herein.

### Kristina Armstrong – Boyle Affidavit of Service

22. I have reviewed the Affidavit of Service of in the matter of *Empire Portfolios, Inc. v. Kristina Armstrong Boyle* under Index number CEC 05-0003836 in the Suffolk County First District Court, Ronkonkoma (the "Armstrong Affidavit of Service").

23. The Armstrong Affidavit of Service contains false statements.

24. I did not sign the Armstrong Affidavit of Service.

25. I did not appear in front of a notary on March 28, 2005 to sign the Armstrong Affidavit of Service.

26. I cannot recall whether I left a Summons and Complaint at 42 Lovers Lane, Huntington, New York on March 24, 2005. I do not have any documentation indicating whether I left any documents at 42 Lovers Lane, Huntington, New York on March 24, 2005.

27. On March 22, 2005 and March 23, 2005, I did not make any attempt to serve a Summons and/or Complaint on Kristina Armstrong Boyle at 42 Lovers Lane, Huntington, New York. I did not go to 42 Lovers Lane, Huntington, New York more than one time.

28. On March 28, 2005, I did not mail a Summons and Complaint to Kristina Armstrong Boyle via "certificate of mailing" nor did I mail a Summons and Complaint to Kristina Armstrong Boyle at all.

29. I do not recall speaking to any neighbors of Kristina Armstrong Boyle.

5

30. I do not recall asking anybody about the military status of Kristina Armstrong Boyle. It was not my general policy to speak to anyone at about the military status of a defendant.

31. I did not attempt to determine Kristina Armstrong Boyle's place of employment, nor did I attempt to locate any other alternative location to effectuate personal service upon Ms. Armstrong Boyle.

32. On information and belief the Armstrong affidavit of service was created using the procedure described in paragraph 8 herein.

### The 69 Other Affidavits of Service

33. I have reviewed seventy-one other Midlantic affidavits of service that were provided by Defendants Cohen and Slamowitz to my attorney in the course of this litigation. ("the 69 affidavits of service"). These 69 affidavits of service indicate that service was performed by me using what is commonly referred to as "nail and mail" service. This type of service is based upon Civil Practice Laws and Rule Section 308(4). The case names and information of these 69 cases are contained in Exhibit A, attached. Upon information and belief, the Law Firm of Cohen & Slamowitz was the Plaintiff's attorney in each of these 69 cases.

34. Each of these 69 Affidavits of Service contains false statements.

35. I did not sign any of the 69 affidavits of service.

36. I did not appear in front of a notary for signature on any of the dates indicated on the 69 affidavits of service.

37. I do not recall whether I left a Summons and Complaint at any of the residences/businesses indicated on the 69 affidavits of service. I do not have any documentation indicating whether I left any documents at any of the residences contained on the 69 affidavits of service.

6

38. I did not go to the residences/businesses of any of the Defendants in these 69 cases more than one time. I did not make any of the attempts at service indicated on any of the 69 affidavits. Upon information and belief, these dates were fabricated by Midlantic, Robert Schusteritsch and/or Vivian Schusteritsch or somebody else at their direction.

39. I did not make any of the mailings indicated on any of the 69 affidavits of service. I do not have any certificates of mailing attesting to any of these mailings, because I did not mail anything to any of the Defendants in these 69 cases.

40. I do not recall whether I spoke to any of the Defendants' neighbors referenced in these 69 affidavits of service.

41. I do not recall speaking to anybody about the military status of any of the defendants referenced in the 69 affidavits of service, but it was not my general practice to ask about a Defendants' military status.

42. I did not make any attempt to determine the place of employment of any of the defendants referenced in the 69 affidavits of service. Nor did I attempt to locate any other alternative location to make service by personal delivery upon any of the defendants referenced in the 69 affidavits of service.

43. On information and belief the 69 affidavits of service were created using the procedure described in paragraph 8 herein.

### The 21 Other Affidavits of Service

44. I have also reviewed 21 other Midlantic affidavits of service that were provided by Defendants Cohen and Slamowitz to my attorney in the course of this litigation. (the "21 affidavits of service"). These 21 affidavits of service indicate that service was performed by me using what is commonly referred to as "leave and mail" service. This type of service is based

7

upon Civil Practice Laws and Rule Section 308(2). The case names and information of these 21 cases are contained in <u>Exhibit B</u>, attached. Upon information and belief, the Law Firm of Cohen & Slamowitz was the Plaintiff's attorney in each of these 21 cases.

45. Each of these 21 affidavits of service contains false statements.

46. I did not sign any of the 21 affidavits of service.

47. I did not appear in front of a notary for signature on any of the dates indicated on the 21 affidavits of service.

48. I do not recall whether I left a Summons and Complaint at any of the residences/businesses indicated on the 21 affidavits of service. I do not have any documents indicating whether I left any documents with any of the people referenced on the 21 affidavits of service.

49. I did not make any of the mailings indicated on any of the 21 affidavits of service. I do not have any certificates of mailing attesting to any of these mailings, because I did not mail anything to any of the defendants in these 21 cases.

50. I do not recall speaking to anybody about the military status of any of the defendants referenced in the 21 affidavits of service, but it was not my general practice to ask about a Defendants' military status.

51. I did not make any attempt to determine the place of employment of any of the defendants referenced in the 21 affidavits of service. Nor did I attempt to locate any other alternative location to make service by personal delivery upon any of the defendants referenced in the 21 affidavits of service.

52. On information and belief the 21 affidavits of service were created using the procedure described in paragraph 8 herein.

The Execution of this Affidavit

53. I am executing this affidavit after being advised by my attorney about all the potential

ramifications of my statements.

54. I have read this affidavit completely and understand the contents.

55. I am not under the influence of any alcohol or drug that is impairing my ability to

understand this affidavit.

56. I am signing this affidavit voluntarily and I am not under any undue pressure or

duress.

Dated: _10-30-06_

Kenneth Vega
Address: 1467 William Floyd Pkwy.
Shirley NY 11967

Sworn to me this _30th_
day of October 2006

Notary Public

FRANCES D. ANGLERO
Notary Public, State of New York
No. 01AN5069279    Suffolk County
Commission Expires December 8, 2009

Witnessed:

Melissa Corwin, Esq.
Somer & Heller, LLP
2171 Jericho Turnpike Suite 350
Commack, NY 11725
Attorney for Kenneth Vega

_10/30/06_
Date

9

## CERTIFICATION

I, KENNETH VEGA, HEREBY CERTIFY, under penalty of perjury that I have carefully read and reviewed the annexed document and that all information contained in that document is true and accurate in all respects to the best of my knowledge and understanding.

I FURTHER CERTIFY, under penalty of perjury, that neither my attorney, nor anyone acting on my attorney's behalf, was the source of any of the information contained in the annexed document; that I provided all of the information contained in the annexed document to my attorney; and that I understand that my attorney, is relying entirely upon my certification that all such information is true and correct.

I FURTHER CERTIFY that the annexed document includes all information which I provided to my attorney which is relevant to such document and that my attorney has not deleted, omitted or excluded any such information.

Dated: 10-30-06

Kenneth Vega

10

## EXHIBIT A

### 1st District Court, Suffolk; Ronkonkoma

| Case Name | Docket/Index # |
|---|---|
| Empire Portfolios, Inc. v. Nathaniel Hines | 3830/05 |
| Empire Portfolios, Inc. v. Leonard T. Fields | 1732/05 |
| Empire Portfolios, Inc. v. Richardo E. Galieas | 1731/05 |
| Empire Portfolios, Inc. v. Juan H. Alfaro | 1730/05 |
| Empire Portfolios, Inc. v. Mariana Soto | 1728/05 |
| Empire Portfolios, Inc. v. Gregory A. Canilleri | 1733/05 |
| Empire Portfolios, Inc. v. Abel R. Santillana | 1734/05 |
| Empire Portfolios, Inc. v. Damaris Polanco | 3835/05 |
| Empire Portfolios, Inc. v. Jennifer Harris | 3837/05 |
| Empire Portfolios, Inc. v. Myel C. Hill | 3834/05 |
| Empire Portfolios, Inc. v. Jimmy Nayek | 3832/05 |
| Empire Portfolios, Inc. v. Benjamin Sokolowski | 3831/05 |
| Empire Portfolios, Inc. v. Ingrid J. Nosten | 1729/05 |
| Portfolio Recovery Associates, L.L.C. v. Rodolfo A. Johnson | 1775/05 |
| Portfolio Recovery Associates, L.L.C. v. Jocelyn C. Hoitsma | 1776/05 |
| Portfolio Recovery Associates, L.L.C. v. Shae L. Farrell | 3860/05 |
| Metro Portfolios, Inc. v. Steadman McLean | 3844/05 |
| Metro Portfolios, Inc. v. Esther McDonald | 1754/05 |
| Metro Portfolios, Inc. v. Tamara Barba | 1753/05 |
| Metro Portfolios, Inc. v. Anthony J. Markee | 1752/05 |
| Metro Portfolios, Inc. v. Adriana H. Diosisio | 1751/05 |
| Metro Portfolios, Inc. v. Xin Zhang | 1750/05 |
| Metro Portfolios, Inc. v. Teena McKenna | 1749/05 |
| Metro Portfolios, Inc. v. John H. Blaise | 1748/05 |
| Metro Portfolios, Inc. v. Kimberly H. Wichman | 1755/05 |

| | |
|---|---|
| Metro Portfolios, Inc. v. Michelle Labarca | 3845/05 |
| Discover Bank v. Kimberly M. Hanney | 1769/05 |
| Discover Bank v. Barbara Wiggins | 3852/05 |
| Discover Bank v. George Robert Jackson | 1770/05 |
| Discover Bank v. Suzanne M. Kramer | 3853/05 |
| Discover Bank v. Pattie Watlington | 4272/05 |
| Discover Bank v/ Jasmine Maria Montoya | 3851/05 |
| Discover Bank v. Karissa L. Maguire | 3850/05 |
| Discover Bank v. John N. Gehrlein | 3849/05 |
| Colorado Capital Investments, Inc.v. Richard C. Perhauch | 1782/05 |
| Great Lakes Collection Bureau Inc. v. Tami H. Gorey | 1779/05 |
| Cardiology Consultants. P.C. v. Frank Mascaro | 3863/05 |
| Palisades Collection LLC v. Aherlene Oscar aka Sherlene Oscar | 1781/05 |

## 4th District Court, Suffolk; Hauppauge

| | |
|---|---|
| California Commercial Capital Corporation v. Claudio Martinez | 3373/05 |
| Metro Portfolios, Inc.v. Florence E. Obrien | 33/74/05 |
| Target National Bank (Formerly known as Retailers National Bank) – Target Visa v. Patricia Cirone | 3375/05 |

## Supreme Court of New York, Suffolk County

| | |
|---|---|
| Discover Bank v. Richard J. Marcisai | 1777/05 |

## Civil Court, Westchester County, City of New Rochelle

| | |
|---|---|
| Discover Bank v. Jeffrey B. Levine | 504/05 |

## Civil Court, Westchester County, City of White Plains

| | |
|---|---|
| Empire Portfolios, Inc.v. Policarpo Salazar | 311/05 |
| RPI Enterprises LLC v.Mildred Lomey | 318/05 |
| Midland Credit Management, Inc. v. Stephanie Smith | 305/05 |
| Discover Bank v. Michelle P. Silber | 317/05 |

12

## EXHIBIT B

### 1st District Court, Suffolk; Ronkonkoma

| Case Name | Docket/Index # |
|---|---|
| Empire Portfolios, Inc. v. David Gonzalez | 3839/05 |
| Empire Portfolios, Inc. v. Ricardo Martinez | 1722/05 |
| Empire Portfolios, Inc. v. Marlene Audain | 1723/05 |
| Empire Portfolios, Inc v. Manda Diaz | 1724/05 |
| Empire Portfolios, Inc v. Ramon Arias | 1725/05 |
| Empire Portfolios, Inc v. Juan R. Tavena | 1726/05 |
| Empire Portfolios, Inc v. Norma Algarin a/k/a Norma Gonzalez | 1727/05 |
| Metro Portfolios, Inc. v. Joe Wyatt | 3846/05 |
| Metro Portfolios, Inc. v. Niverca Arroyo | 4274/05 |
| Metro Portfolios, Inc. v. Mustafa Duran | 1745/05 |
| Metro Portfolios, Inc. v. Ruben Benitez | 1746/05 |
| Metro Portfolios, Inc. v. Antonio Colon | 1747/05 |
| Discover Bank v. Fabio Cruz | 4273/05 |
| Portfolio Recovery Associates, L.L.C.v. Pamela J. Calhoun | 3861/05 |
| Great Seneca Financial Corp. v. Mohsin Rouf | 1778/05 |

### Civil Court, Westchester County, City of Rye

| | |
|---|---|
| Discover Bank v. Juan C. Moreno | Unknown |

### Civil Court, Westchester County, City of White Plains

| | |
|---|---|
| Midlantic Credit Management, Inc. v. Mario Patino | 308/05 |

### Supreme Court of New York, Westchester County

| | |
|---|---|
| Empire Portfolios, Inc.v. Amelia Perez | 211/05 |
| Empire Portfolios, Inc. v. Alberto Suarez | 666/05 |
| RPI Enterprises LLC v. Gary S. Herman | 277/05 |
| Worldwide Asset Purchasing, LLC v. Ana Gonzalez | 19968.04 |

EXHIBIT B

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ----------------------------------------X
3    ELIZABETH COBLE,
     MILAGROS HARPER and
4    DENNIS HARPER, on behalf of
     themselves and others
5    similarly situated,
6                        Plaintiffs,

                                        Civil Action No.
7        -against-                      11-cv-1037 (VB)
8    COHEN & SLAMOWITZ, LLP, DAVID
     COHEN, ESQ., MITCHELL
9    SLAMOWITZ, ESQ., LEANDRE JOHN,
     ESQ., AND CRYSTAL S.A. SCOTT,
10   ESQ.,
11                       Defendants.
     ----------------------------------------X
12
13                   9 East 40th Street
                     New York, New York
14                   June 13, 2012
                     10:30 AM
15
16
17
18
19       Examination Before Trial of NON-PARTY WITNESS,
20
21       KENNETH VEGA, held pursuant to Subpoena, at the
22
23       above time and place, before Ruthayn Sgaglio, a
24
25       Notary Public of the State of New York.

1                    - Kenneth Vega -

2      fired because of Cohen & Slamowitz.  It was -- to me

3      the way he made it seem was that he was going to go

4      out of business anyway.  It wasn't a surprise.

5           Q    As far as you know has Midlantic gone out

6      of business?

7           A    As far as I know.  I don't check.

8           Q    Do you remember that you signed an

9      affidavit associated with the Caprino case?

10          A    Yes.

11          Q    That was a case in which you were a

12     defendant?

13          A    Yes.

14          Q    You signed that affidavit on behalf -- as

15     part of an understanding that you reached with

16     counsel for the plaintiffs in that case?

17          A    Yes.

18          Q    Do you remember reviewing that affidavit

19     when you signed it?

20          A    Yes.

21          Q    Do you remember whether you believed at

22     the time that you signed it whether everything in

23     the affidavit was true and correct?

24          A    Yes.

25               MS. ALWARD:  Objection.

1                        - Kenneth Vega -

2        Q    Do you still believe that everything in

3    the affidavit is true and correct?

4        A    I would have to read it again, but at that

5    time, yes.

6        Q    At that time you believed so?

7        A    At that time it seemed correct to me.

8             MR. KLEIN:  Let me have a copy of the

9        Affidavit marked.

10   (Plaintiff's Exhibit 1, Marked for Identification.)

11           (Discussion held off the record.)

12       Q    Mr. Vega, do you recognize this document?

13       A    Not really, no.

14       Q    Does it appear to be the Affidavit that we

15   have been discussing?

16       A    Sure, yes.

17       Q    Have you seen this document since 2006

18   when you signed it?

19       A    No.

20       Q    Do you have a copy of it in your own

21   possession?

22       A    Not that I'm aware of it.

23       Q    I'm going to give you a couple of minutes

24   to read through it so I can ask you questions about

25   it.  Let me know when you are done.

1                    - Kenneth Vega -

2              (Witness perusing document.)

3        A    Okay.

4        Q    Let's start at the back with the

5    certification, Mr. Vega.  Do you see the page that

6    says Certification at the top?

7        A    Yes.

8        Q    I believe that's page ten of the document.

9    It says ten at the bottom.

10       A    Yes.

11       Q    Is that your signature on that

12   certification?

13       A    Yes.

14       Q    Do you remember signing it?

15       A    Yes.

16       Q    Do you remember that you understood at

17   that time you were signing under penalty of perjury?

18       A    Yes.

19       Q    You did believe that at that time that

20   everything in the Affidavit was true and correct,

21   right?

22       A    Yes.

23       Q    As you reread it is it still the case that

24   you believe everything in the affidavit to be true

25   and correct?

1                          - Kenneth Vega -

2          A      Mostly, yes.

3          Q      When you say mostly, is there something

4     that you don't believe to be true and correct?

5          A      It's a long time ago.  I don't have a

6     complete recollection of everything, so I'm going

7     based on the time it was signed.

8          Q      Is there anything in the Affidavit that

9     you now believe to be wrong?

10         A      Not particularly, no.

11         Q      Is it that you just don't remember?

12         A      I can't recall.

13         Q      Does it describe generally the process you

14    were asked to follow to serve complaints when you

15    worked at Midlantic?

16         A      Yes.

17         Q      The description of what you did in

18    connection with your work at Midlantic is accurate,

19    right?

20         A      Yes.

21         Q      If you could take a look at page nine, the

22    Declaration, is that your signature as well?

23         A      Yes.

24         Q      Below that there is a signature of someone

25    named Melissa Corwin.  Is that the lawyer that

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------x

ELIZABETH COBLE, MILAGROS HARPER
and DENNIS HARPER, on behalf of
themselves and all others similarly
situated.

      Plaintiffs,

      v.             11-CV-01037 (JFM)

COHEN & SLAMOWITZ, LLP,
DAVID COHEN, ESQ.,
MITCHELL SLAMOWITZ, ESQ.
LEANDRE JOHN, ESQ.,
CRYSTAL S.A. SCOTT, ESQ.

      Defendants.

----------------------------x

                 June 14, 2012
                 10:15 a.m.

      Deposition of ALFRED SMITH, taken by

plaintiffs, pursuant to subpoena, at the

offices of Schlanger & Schlanger, 9 East

40th Street, New York, NY 10016, before

Joseph B. Pirozzi, a Registered Professional

Reporter and Notary Public of the State of

New York.

2       those to serve?

3               A.      Yes.

4               Q.      Is that correct?

5               A.      Yes.

6               Q.      Is it safe to say that it would

7       be on average somewhere between 10 and 30

8       on a typical day, depending on the

9       geographic location?

10              A.      I can't say.  You know, at all.

11      I really can't say.

12              Q.      Where were you doing the service?

13      In other words, where were the addresses

14      that you were serving?

15              A.      Manhattan, Brooklyn.

16              Q.      Anyplace other than Manhattan and

17      Brooklyn?

18              A.      No.

19              Q.      And when you were doing that

20      work, when would your day typically start

21      and when would it typically end?

22              A.      I don't remember.  I don't

23      remember.

24              Q.      Was it pretty consistent?

25              A.      Some mornings I would start maybe

2        like 9, 10 in the morning, something like

3        that.

4            Q.     And was it roughly an eight-hour

5        day?

6            A.     No, it wasn't.  About, it could

7        have been about six.  Actually, I don't

8        remember.  It was so long ago.

9            Q.     It could have been about six

10       hours or about 6 o'clock in the evening

11       that you stopped?  I didn't understand.

12           A.     About six hours.

13           Q.     Did you often work nights?

14           A.     No.  No.

15           Q.     Am I correct in thinking that you

16       were paid per service?

17                  MS. ALWARD:  Objection.

18           Q.     In other words, that you got paid

19       for each set of papers that you served?

20           A.     Yes.

21           Q.     And how much did you get paid?

22           A.     $5 for every paper.

23           Q.     So a summons and complaint

24       together would be one paper and you would

25       serve that and get five bucks for that, is

service worked.  You would go to his house,
pick up the summonses and complaints and
then what would happen?

     A.    That would be it.  I would say --
I would deliver them and he would say,
"Well, when you deliver them, bring me back
the slips."  And I would bring him back the
slips.  I would either bring them back to
him or put it in his mailbox.

     Q.    When you say the slips, what was
the slip?

     A.    The yellow slip of papers.
Deliver the subpoena and write with the
person's address.  A lot of times you would
just leave it at the house and that was it.

     Q.    So when you were serving these
papers, am I right in thinking that
sometimes somebody would come to the door
and sometimes somebody wouldn't --

     A.    Lots of times people wouldn't
come to the door, yes.

     Q.    For the court reporter's sake,
let me finish my question before you start
answering, otherwise it is tough for him.

2              So if they wouldn't come to the

3      door, what would you do?

4          A.    I would take the mail, slip it

5      under the door and leave it there or put it

6      in the mailbox.

7          Q.    If it was the first time that you

8      were visiting that address, is that the

9      procedure you would use?

10          A.    Well, sometimes I would go and

11      come back and then, you know, in like two

12      attempts, three attempts, and then that's

13      what I would do.

14          Q.    Would you sometimes leave the

15      papers on the first attempt?

16          A.    No.  No.  No.

17          Q.    How would you know if you made

18      any prior attempts for an address?

19          A.    I would just keep going back and

20      forth.

21          Q.    I'm sorry.  Let me reask the

22      question.

23              So you would get a stack of

24      summonses and complaints from Bob

25      Schusteritsch, right?

2          A.    Uh-huh.

3          Q.    Did you then mail the summonses

4    and complaints to anybody?

5          A.    No.

6          Q.    Did you ever -- was it your

7    regular practice to speak with a neighbor

8    before you tried to serve the address?

9          A.    No.

10         Q.    Was it your regular procedure to

11   speak with a neighbor at any time during

12   the process?

13         A.    No.

14         Q.    Did you prepare an affidavit of

15   service for each case in which you served a

16   summons and complaint?

17         A.    No.

18         Q.    Do you know if somebody prepared

19   an affidavit of service in those cases?

20         A.    I don't know.

21         Q.    Was it your regular practice to

22   sign an affidavit of service in the cases

23   that you served a subpoena?

24         A.    I never signed anything.

25         Q.    I just want to be clear.  You

2      didn't sign affidavits of service in these

3      cases?

4            A.      What do you mean?  Like I

5      signed -- no, I never signed anything.  No

6      affidavit.  Nothing.

7            Q.      How would Midlantic know -- let's

8      talk about an address in which you made

9      more than one attempt, and I think if I

10     understood your testimony before, your

11     testimony was sometimes you would make two

12     or three attempts, is that right?

13           A.      Yes.

14           Q.      How would Midlantic know on what

15     date and at what time you made those?

16           A.      Write it on the slip, on the

17     yellow slip that he had, you know.  And you

18     give it back to him and that was it.

19                   Like I told you, I would drop

20     them in his mailbox and that's all I knew.

21           Q.      Were those second and third

22     attempts often on the same day as the first

23     attempt?

24           A.      No.  Sometimes, you know, it

25     could be the next week and sometimes it

2            Can you tell me what this

3       document is?

4            A.    No, I never seen this before.  I

5       can't tell you.

6            Q.    Have you ever seen an affidavit

7       of personal service before?

8            A.    Nope.

9            Q.    Can you tell me if you think you

10      signed this document?

11           A.    I didn't sign this.

12           Q.    Do you know who signed in the

13      spot above your name?

14           A.    No, I don't.

15                 (Affidavit of personal service in

16           the matter of New Century Financial

17           Services v. Ana R. Caba marked

18           Plaintiff's Exhibit 9 for

19           identification)

20           Q.    I'm going to put in front of you

21      something I marked as Plaintiff's

22      Exhibit 9.

23                 Can you tell me what this

24      document is?

25           A.    I can't tell you.

2        this document?

3                A.      No, never.

4                Q.      I will leave that in front of you

5        for a second.

6                        If I understood your testimony

7        earlier, you generally worked something

8        approximating six hours a day, starting

9        somewhere approximately around 9 or 10 in

10       the morning?

11               A.      Uh-huh.

12               Q.      And that you didn't work nights,

13       is that correct?

14               A.      I told you that.

15               Q.      Okay.  I just wanted to make sure

16       I understood that.

17               A.      I told you one time.  Why am I

18       going to recant on my story?  I told you

19       that.

20               Q.      So if you look at this document

21       and you look at where it talks about prior

22       attempts here, do you see where it says one

23       attempt was made on August 2, 2005 at 3

24       p.m. and another attempt was made on August

25       3, 2005 at 8:45 p.m.?

2          A.    Okay.  It wasn't me.  I never

3    seen it before.

4          Q.    I understand you never seen this

5    document --

6          A.    I wasn't me.  Didn't I tell you?

7    I wasn't in no city at 8:45, okay, on that

8    day.  All right.  Now, I understand, but it

9    is starting to irritate me and I didn't

10   come here for this.

11         Q.    I'm not trying to irritate you.

12         A.    You are.  You are asking me the

13   same things over.  I told you.  I'm not

14   trying to get irate, but, you know, I told

15   you once, I know nothing about what was

16   going on.  I can just tell you what I can

17   tell you.  That's nothing else I can tell

18   you.

19         Q.    That's all I want you to do?

20         A.    Stop asking me what time I was in

21   the city.  If I tell you I wasn't working

22   nights, I wasn't working nights.

23         Q.    All right, I believe you.

24         A.    Okay.  Stop trying to ask me over

25   again.

# EXHIBIT D

**C O N F I D E N T I A L**

To be filed under seal pursuant to
Confidentiality Order dated August 13, 2012.